JULY 1829.

Moore, Ex'r.
v.
Dudley and
Wife.

CARRINGTON v. CALLER, *and*
HOLDER v. MEGGISON and HILL.

Stewart.
2s 175
117 670

1. An agreement which is founded on a consideration which is against public policy, whether it be for the whole, or only for part, is void.
2. An association formed for the purpose of purchasing lands at the public sales of the lands of the United States, and re-selling them at a profit, by preventing competition, is unlawful, as contravening public policy.
3. A bond given to such an association for land sold by them, is void; their articles of agreement having unlawfully stipulated for the purchase and sale of said lands by them.
4. On a demurrer to evidence, the Court must take as true against the party demurring, all facts, and all inferences, which a jury could legitimately draw from those facts. Yet the same rules of evidence govern as in other cases, as to the inferences of witnesses.

THESE were actions of debt, brought in the year 1822, in the Circuit Court of Monroe county, by the plaintiff in error against the defendants, who were also defendants in the Court below, to recover on two specialties, made by the defendants respectively, on the 29th of April 1819. In the case of Carrington, the instrument was made by James Caller and Robert Caller, and payable to A. B. Carrington or bearer. In the case of Holder, the note was made by W. Meggison and W. Hill, payable to E. Parsons, and assigned by him to the plaintiff J. Holder. The Causes were not precisely similar, but as they involved the same principles, and grew out of the same transaction, they were tried together. There were in the Courts below, many actions pending on similar notes; there were also a great number of notes of the same de-

JULY 1829.

Carrington
v.
Caller

scription in the hands of different individuals, amounting to a very great sum of money, and it was understood that the right to a recovery was to depend on the decision of those causes: For which reason, they were, after several protracted and elaborate arguments of the most able character, decided by the court upon great deliberation.

The pleas of the defendants embraced the defences, 1st, that the notes were delivered without the name of any payee being inserted, and that the payees name had been inserted without the authority, knowledge or consent of the defendants. 2d, That they were fraudulently obtained; and 3d, that the consideration on which they were founded, was illegal as being contrary to public policy. The defendants introduced much testimony to sustain their pleas, which is too voluminous to be here inserted, but the substance of which appears in the opinions delivered by the judges, together with their views of it. To this evidence the plaintiffs demurred in law, and the plaintiffs joined in demurrer; and by consent, judgments *pro forma* were rendered on the demurrers in the Court below, for the defendants, in order to bring the causes before the Court without prejudice to either party. The error assigned is , that on the demurrers to the evidence, the judgment should have been for the plaintiffs.

HITCHCOCK and GORDON, for the appellants.

BAGBY, THORINGTON, ELLIOTT & KELLY, for the appellees.

By JUDGE TAYLOR.  * It is to revise the judgment rendered by the Court on the demurrer of the plaintiffs to the defendants' evidence, that this cause is brought to this Court.

The action was brought upon an instrument, of which the following is a copy, viz:

"On or before the 28th day of April 1822, we or either of us promise to pay A. B. Carrington or bearer, one hundred and fifty dollars (with interest from the date if not punctually paid) for value received. Witness our hands and seals, this 29th day of April 1819.

(Signed,)   JAMES CALLER, [SEAL.]
          ROBERT CALLER. [SEAL.]"

---

* NOTE.—This opinion appears to relate solely to the case of *Carrington v. Caller*, although both cases were disposed of by the principles settled by it. By refering to the opinions delivered by Judges White and Collier, the facts constituting the distinction between the two cases will be seen.

JULY 1829.

Carrington
v.
Caller.

It is proved that a public sale of lands by the United States, was advertised to take place at St Stephens. That in anticipation of the sale, and shortly before it was made, several persons associated themselves together for the purpose of preventing competition at this sale, and thereby obtaining the lands at the minimum price. That this association or company entered into a written agreement which was to the following effect: "That no individual should have more than one share, and that none but a land buyer should be permitted to join the company. That each person on joining the company should pay one thousand dollars. That he should not bid at the government sales. The lands were to be bought by persons named by the committee," (this committee consisting of persons selected by the company at the time of its organization, to whom its interests were confided,) "and afterwards resold at public sale, where all persons were to be permitted to bid; and the difference between the company and government sales was to constitute a fund which was to be equally divided among the members of the company."

There is also much evidence tending to prove violations of these terms by the committee. That to secure a large harvest to themselves, they inserted many names of persons who were not members, as such, several of which were fictitious; and other acts were done by them in contravention of the agreement, which it is unnecessary to state, as they form none of the data on which the court has arrived at a decision.

It is proved that the members of the company, especially those who constituted the committee, were active in ascertaining the names, and particularly the pecuniary means of all strangers who arrived in town with the intention of purchasing land, and in urging every monied man, both stranger and acquaintance, to unite with them, promising an ample return of profit in the event of his doing so, and threatening to use the power which their united capital gave them, to make him give exhorbitant prices for the lands he might purchase, or to prevent him from purchasing any, if he would not make common cause with them. It is also proved that persons who were unable to raise the sum of money necessary to constitute them members of the company were operated upon in another way to induce them to aid in effecting the objects of the company, viz: preventing competition at the government sales and adding to the amount of the joint capital. Such per-

23

JULY 1829.

Carrington
v.
Caller.

sons it is true were not received as members of the company, but as they generally consisted of settlers on the lands which were to be sold, and their single object was to purchase the places on which they resided, offers were made to them by members of the company, that if they would not bid, the company would buy the land they wanted, and let them have it at a stipulated advance, generally double the government minimum price. In this way Nicholson, one of the witnesses, purchased one quarter section, and from the evidence, the inference is irresistible that many others did the same. These persons too were threatened, that if they should bid against the company, they should be either prevented from purchasing at all, or compelled to give ruinous prices; which threats, the obstinate, in the few instances in which any had the temerity to continue so, found in the end, were literally executed. Witness the same Nicholson, who, before he would agree to the terms prescribed by the company, had been run up on four quarter sections which he purchased to $15, $10, $9, and $10, per acre. In this way, it appears from the testimony, the company succeeded in putting down opposition to their schemes, and purchased a large quantity of land, all at the minimum price of two dollars per acre, with the exception of a few quarter sections, which it is evident fell on their hands by their intention to run the settlers to the highest point, but who gave way sooner than was expected.

After the purchases were thus made, the company in conformity with their agreement, proceeded to sell at public sale the land thus purchased, on the following terms, viz: one fourth cash, the balance to be secured by notes with security, payable in four annual instalments. At this sale it appears to have been the object of many members of the company to run the land up to high prices, and as much as they could, to avoid purchasing themselves. When the sale was closed, the money and notes of the purchasers were received according to the terms, the payées' names being left blank in the latter, with the understanding that the blanks should be filled up to the person to whom they should be allotted in the distribution which was agreed to be made of them among the members of the company. The instrument sued on was one thus given and distributed, the defendant having been a purchaser at the company sale, and in the distribution, this instrument was allotted to the plaintiff, he being one of the company, and was

JULY 1829.

Carrington
v.
Caller.

filled up by him according to the understanding. The defendant was also one of the company though not one of the committee. This, I believe, contains a statement of all the evidence material to a correct decision of the legality or illegality of the contract, and the consequent right of the plaintiff to recover.

It was on a demurrer to the defendant's evidence, that a judgment *pro forma* was rendered for the defendant. It may be well, first, to understand what is the effect of a demurrer to evidence.

This mode of wresting the decision of facts from a jury, and devolving it upon the Court, has never been favored; but a party certainly has the power to do it. When, however, it is done, the evidence is to be taken most strongly against the party demurring, and the Court is to receive as true, not only every fact which is plainly proved, but also every inference which can legitimately be drawn from the facts, against the party demurring. And the reason of the rule is this, that a party shall never be injured by an act of his adversary done without his consent; and as it is the act of his adversary to withdraw the issue from the jury, therefore, every inference the jury could have properly drawn in his favor, shall be drawn by the Court. Yet, while these positions are such as the law assumes, it is evident that the evidence is to be governed by the same rules as in other cases, and that the inferences and deductions of witnesses, with which this record is pregnant, can have no effect upon the decision of the Court.

The defendant resists a recovery on several grounds. I shall only examine one of them, which is this: "that no judgment can be rendered for the plaintiff, because the consideration for which the instrument on which the action is founded, was against public policy, therefore illegal and void."

It is a plain and undeniable principle of law, that if the consideration, or any part of the agreement, upon which the bond which is the foundation of this action, was executed, was illegal or against public policy, the bond is void, and there can be no recovery thereon. This position has been taken by the defendant's counsel, was not denied in the argument, nor can it be controverted. *a*

The inquiry then is, was the consideration for which this bond was executed, against public policy and illegal?

But before this part of the subject is directly investigated, it is necessary to determine upon the character of the agreement entered into by the company, as respects the

*a* Powell on contracts 176.
1 Comyn on contracts 30.
Wheat. 258.

interests of the United States; and whether that agreement, so far as it was intended to affect the sale of its lands by the Federal Government, was against public policy, and consequently illegal.

A combination between two or more persons by which it is agreed, that one or more shall not bid at an auction sale, and the other shall make the purchases for the benefit of all the parties, has uniformly been decided to be a contract against public policy, and that no recovery can be had against the bidder if he refuse to carry the agreement into execution, but he may retain all the profits of the speculation in his own hands. See 6th Johnson's Reports 194, 8th Johnson's Reports 346, and 13th Johnson's Reports 112. The case last cited is very strong. Judge Spencer, who delivered the opinion of the Court, first determines that the contract was not *nudum pactum*, but, except for its illegality, sufficient to sustain the action; but he proceeds to say: "Whatever may have been the motives of the parties in making the agreement, and however upright their intentions, the question recurs, *is* not the promise made by the defendant, void, as contravening established principles of public policy? If the considertion be ever so meritorious, yet if the act agreed to be done, and which forms the basis of the agreement, be unlawful, the promise cannot be enforced in a Court of law." He proceeds: "The judges who delivered opinions in the case of *Jones v. Cawell*, held, that the law had regulated sales on executions with a jealous care, and had provided a course of proceeding likely to promote a fair competition, and that a combination to prevent competition, was contrary to public policy and to the interests of the original debtor, whose property was liable to be sacrificed by such combinations. The principle was recognized in *Doolin v. Ward*, [a] and in *Willin v. How*. [b] These were cases of sales at auction; but the principle applies with equal, nay more force to sales on executions." He continues: "It has been urged that the plaintiff was not bound to bid on the second execution, and was, therefore, at liberty to to enter into this agreement. This is not the test of the principle. In none of the cases cited was the party bound to bid; but being at liberty to bid, he suffered himself to be bought off, in a way which might prevent a fair competion. The abstaining from bidding, upon concert and by agreement, under the promise of a benefit for thus abstaining, is the very evil the law intends to repress."

[a] 6 John. 154.
[b] 8 John. 346.

It appears then that the case of *Thompson v. Davies*, in which the opinion of judge Spencer, from which the above extract is taken, was delivered, did not turn upon its being a sale under execution, relative to which the agreement was made, which was declared void, but that it is equally illegal to combine for the purpose of putting down competition at any auction sale, because such combinations tend to cause a sacrifice of the property thus sold.

It is unnecessary to enter into a labored train of reasoning to support this decision; its propriety is too apparent. But were it of a more doubtful character, the decisions are too uniform, and the principle too well settled, now to be disturbed. [a]

It is now necessary to inquire, does this rule apply to a sale of lands at auction by the United States? It is urged that the government is interested in fostering the interests of its citizens and securing their prosperity; that it is not consistent with these objects nor good policy, that it should sell its domain at high prices to the citizen; and that establishing a minimum price, proves that nothing more is expected or demanded by the government; therefore any combination intended to secure the lands to the purchasers at the minimum price, is perfectly consistent with the policy of the government, and of consequence lawful.

It might if necessary be replied in this instance, that the facts of the case do not show a disposition, on the part of the ruling spirits of this company, to secure to the citizens at large, the purchase of the government lands at the minimum price, and thus to promote the prosperity of the country, by securing the comfort and pecuniary independence of the citizen: on the contrary, the manifest object of the company was to swell their own coffers by unjust exactions from others. Else why by threats and promises deter the humble settler from securing the place on which his cabin and his family were situated, at the government sale? Why require that he should not bid, but that the land should be all purchased, which was of any value, by this monopolizing company? Why exact from him a large advance, generally one hundred per cent at least, for the privilege of paying the amount demanded by the government, for the land which he wanted to live upon and to cultivate? Whatever may have been the intentions of the government, these facts afford but little proof that this company wished to advance the prosperity of the citizens generally, by enabling them to obtain lands at the minimum price.

[a] See Cowper 395, 6 Term Rep. 642.

But in judging of the policy of the country, we are not to be governed by opinion and speculation. when there is plain law to guide us. The acts of Congress evince that it is not the intention of the government to invest its citizens with titles to the public lands at the lowest specified price, but that the lowest price is specified to secure, so far as is practicable at a public sale, the real value of the land.

Nothing is more common than for a person who offers his property for sale at auction, to make it known to bidders that a price is fixed on, below which it will not be permitted to be sold. Yet who has ever understood that this was proof that the owner wished no higher price to be bid? Surely it gives conclusive evidence to the contrary; nor has it ever been supposed that a combination to prevent competition, where there was such limitation of price would be less illegal, than in other cases.

If it had been the policy of the United States to dispose of their lands at two dollars per acre, and no more, it would have been easy for Congress to have made this intention obvious, nay it would have been easy to have effected the object. It would only have been necessary to have permitted entries to have been made at this price, and complete effect would, at once, have been given to such intention. On the contrary, efforts which have been made to obtain the passage of such a law, and there have been many, have proved unavailing. It is evident to me that the object of the government, as declared by its laws, has been to sell the public lands for the highest price they would bring, and the minimum price has been established with a view directly in opposition to the one contended for by the counsel for the defendant in error.

The inquiry results then, was this company formed for the purpose of putting down competition at the sale of the public lands at St Stephens?

To show that it was, more perfectly than the evidence proves it, would be impossible. It was the avowed object for which the members composing it associated themselves together; it is expressed in the agreement which bound them together, and it is not only apparent that this was their intention, but equally clear that they were altogether successful. The lands were equally valuable at the time they were sold by the government, as when sold by the company. Only two or three days intervened between these sales; no additional value was given to the lands by

improvements put upon them by the company, yet at the last sale, it is evident, they must have been bid off at an advance, probably of several hundred per cent. The witness, Darrington, received in cash at the close of the sale, by division of the spoils of the company, one hundred and twenty-five per cent. profit, on the amount placed by him in the hands of the committee; and how much more his part of the dividend in the notes came to, we are not informed; but as only one fourth of the sum bid was paid in cash, it is no difficult matter to arrive at a conclusion. The company then did combine to put down competition at the sale of the government lands, and the agreement by which such combination was formed was against public policy, consequently illegal and void.

But although this was the case, yet unless such illegal agreement embraced the sale by the company, unless it formed a part of the contract by which the defendant became a purchaser at the company sale, and in consideration of which purchase he executed the bond sued on, it is no defence to him, and judgment must be rendered for the plaintiff in error. I will now endeavor to investigate this part of the case.

The law which governs this point is so lucidly laid down, and the decisions relating to it are so generally referred to in the case of *Armstrong v. Toler,* [a] that it is only necessary to refer to that case for information. In that case the judgment of the Circuit Court, in favor of the plaintiff, was affirmed: but there, it was determined that the contract sued on had no connexion whatever with the illegal one upon which the defendant rested his defence.

The case was as follows: an action of assumpsit was brought by Toler to recover from Armstrong a sum of money paid by Toler on account of goods, the property of Armstrong and others, consigned to Toler, which had been seized and libelled in the District Court of Maine, in the year 1814, as having been imported contrary to law. The goods were shipped during the late war with Great Britain, at St Johns, in the province of New-Brunswick, for Armstrong, and other citizens and residents of the United States, and consigned to Toler, also a domiciled citizen of the United States. The goods were delivered to the agent of the claimants, on stipulation to abide the event of the suit, Toler becoming liable for the appraised value; and Armstrong's part of them was afterwards de-

JULY 1829.

Carrington
v.
Caller.

a 11 Wheat,
258.

JULY 1829.

Carrington
v.
Caller.

livered to him, on his promise to pay Toler his proportion of any sum for which Toler might be liable should the goods be condemned. The goods having been condemned, Toler paid their appraised value, and brought this action to recover from Armstrong his proportion of the amount. The charge of the judge of the Circuit Court is given at length in the statement of the case, and not only the result of that charge, but the reasoning by which it is sustained, is dwelt upon considerably by Chief Justice Marshall, who delivered the opinion of the Supreme Court. We have the point discussed by the Circuit Court, and which was revised in the Supreme Court, in the following words of the Chief Justice: *a* "The point decided" (below) "is, that a subsequent independent contract, founded on a new consideration, is not contaminated by the illegal importation, although such illegal importation was known to Toler when the contract was made, provided he was not interested in the goods, and had no previous concern in the importation." The presiding judge in the Circuit Court, in charging the jury, thus expresses himself: *b* "I understand the rule, as now clearly settled, to be, that where the contract grows immediately out of, and is connected with, an illegal or immoral act, a Court of justice will not lend its aid to enforce it, and if the contract be in part only connected with the illegal transaction, and growing immediately out of it, though it be in fact a new contract, it is equally tainted by it. As if the importation was the result of a scheme to consign the goods to the friend of the owner, with the privity of the former, that he might protect and defend them for the owner in case they should be brought into jeopardy. I should consider a bond or promise afterwards given by the owner to his friend, to indemnify him for his advances on account of any proceedings against the property or otherwise, to constitute a part of the *res gesta*, or of the original transaction, though it purports to be a new contract."

The position taken by the Circuit Court, in this supposed case, is expressly sustained in the opinion of the Supreme Court. Let us test the case before us by it. The obvious meaning of the judge is, that should an illegal agreement contain a stipulation, that something, upon the happening of a contingency, should be done by one of the parties, which if done without such stipulation in the illegal agreement, would form a second and independent contract, its being so stipulated in the illegal agree-

*a* page 271.

*b* page 261.

ment, would cause it to be tainted by the original consideration, and it would be void.

In the case put, goods are shipped contrary to law, it is agreed that the consignee shall, when necessary, and if libelled, defend them, and that the consignor will indemnify him for the expenses which may be incurred in doing so. The goods are libelled, the consignee does defend them and pay the expenses consequent on the suit, the consignor executes to him his bond or note for the amount of the expenses thus incurred and paid; this instrument is tainted with the illegality of the importation, and is void. Why is it so tainted? Because it was contemplated by the parties, and provided for in the first agreement. If the goods had been shipped with the simple understanding that the consignee should receive and sell them, and he had paid expenses consequent upon their being libelled, without any previous engagement to do so, and the owner or importer had subsequently promised to pay those expenses, there is no doubt but the execution of this promise might have been coerced at law, although the consignee knew of the illegality of the importation. This, in fact, would have been substantially the case then on trial. And the reason is, that it is lawful for a man to defend a suit of this description, therefore it must be lawful for him to borrow the money to enable him to do so, even of one having a knowledge of the illegality of the original transaction. Thus it appears that an agreement which is entirely innocent in itself, may be rendered illegal and void simply from its being included with one which is against public policy, which is so contaminating, that it taints every thing with which it comes in contact.

To apply this to the case before us. The members of the Court all concur in the opinion that the combination to prevent competition in the sale by the United States was illegal, and therefore not binding on those who entered into it. Indeed, this point was so manifestly against the plaintiff, that his learned counsel seemed, in the argument, almost to yield it. But the same agreement by which this combination was formed, contained a stipulation that the land purchased by the company should be immediately resold at auction; it was so resold, and the defendant, as one of the purchasers, made the promise of payment which is the foundation of this action; and it is insisted that this is an independent contract. How independent? Was not the land sold by the express terms contain-

24

ed in the illegal agreement? To this question, there can be but one answer; it was. If it was illegally purchased, must it not have been illegally sold? To my apprehension it would seem so. A system of operations was fixed upon by this company, of acquisition and disposing of property in the lump; the mode of acquisition is illegal, which is apparent upon the face of their articles of association; these same articles prescribe the terms on which the disposition is to be made; the disposition is to be made according to those terms, and yet it is insisted this is a contract totally independent of the first. To my mind this is strange logic. It is said that it is perfectly lawful either for a company or an individual to sell lands which they own; so it is perfectly lawful for A to lend B money to defend a lawsuit in the general, yet we have seen above that there may be cases in which it is unlawful. But it is urged, that notwithstanding the land was illegally acquired, still the holder may lawfully sell it, and the purchaser will be bound to pay him the purchase money, unless the original vendor sets up his title. I do not dispute this, unless the mode of sale was stipulated in the illegal agreement by which it was acquired. So where goods illegally imported are libelled, it is legal for a person who has advanced money at the instance of the defendant, to defend the suit, to sue him and recover the amount. But if the person who makes the advance does it by virtue of an agreement made with the importer concerning the unlawful importation, he cannot effect such recovery. Suppose this had been an agreement, that a company, of which the defendant was one, should acquire title to lands in a manner prohibited by law, and that the company should convey them to the defendant for a specified advance, and, to make the case more applicable, I will suppose the lands are not designated in the agreement, except that they are to be of a particular value. Would not this agreement be tainted throughout? and if such purchase by the company and conveyance to the defendant were to take place, could any recovery be had by the company on a bond given to them as the consideration? Clearly not; but he would hold the land against the company, discharged of such bond. Can then the circumstance of a public sale being stipulated, when one of the company purchases at that sale, vary the nature of that instrument so far as to render it binding and obligatory? To me this seems impossible. The sale by the company of the whole of this purchase at

one and the same time, is expressly provided for by the illegal agreement to purchase of the United States. The whole of that agreement, and every contract growing directly out of it, is void, as well that part of it which prescribes the mode of sale of the lands to be purchased, as the rest. But the sale of the company, at which the defendant became a purchaser, and in consideration of which purchase he executed the instrument sued on, was expressly provided for in the original unlawful agreement; therefore, the execution of the note of the defendant grew immediately out of the original agreement, and it is void; and this becomes the more clear, when it is remembered that the defendant himself was a member of the company, and a party to the whole transaction. In the language of the Court in the case of *Armstrong v. Toler*, "the contract is in part connected with the illegal transaction, and growing immediately out of it, though it be in fact a new contract." Indeed it can scarcely be termed a new contract, so intimately is it interwoven with the stipulations contained in the agreement entered into by the company for the purchase of the public lands. Had the purchases been effected, and no sales made, the agreement would not have been fulfilled; and as it was necessary for the company to sell before their agreement was executed, it was certainly as necessary for some persons to purchase; therefore the purchase by the defendant, and the execution of the instrument sued on, grew immediately out of the illegal agreement.

Chief Justice Marshall, in his very able opinion before refered to, cites several cases from English books, in all which the turning point was, "is the contract entirely a new one, distinct from, and unconnected with the illegal transaction, or had it any relation to it?"

If in the case of illegal contracts, money was advanced by one of the parties, even in an incidental way, for another, he could not sustain an action to recover it back. As in the leading case of *Faikey v. Reynous;* [a] the plaintiff and one Richardson were jointly concerned in certain contracts prohibited by law, on which a loss was sustained, the whole of which was paid by the plaintiffs; and a bond was given by Richardson to secure the repayment of his proportion of the loss. On this bond there was a recovery, Lord Mansfield presiding, on the general ground, that if one person apply to another to pay his debt, whether contracted on the score of usury or for any other pur-

[a] 4 Burrow 2069.

*a* Page 410.

*b* 3 Term Rep.
418.

pose, he is entitled to recover it back again. In 6 Term Reports *a* Ashurst, Justice, says: "The defendants are held liable because they have voluntarily given another security." But in the case of *Faikey v. Raynous*, the defendant would not have been liable had he not executed his bond voluntarily after the money was advanced. The payment of the money by the plaintiff would not have authorized the recovery, with the subsequent and independent obligation of the defendant; and if the original agreement had contemplated the payment of the money by the plaintiff, the bond subsequently executed, we are bound to believe from the report of that case, would not have validated the transaction.

In the case of *Petrie* and *another, Executors* of *Keeble v. Hannay,* *b* this distinction between a voluntary payment, and one made on the request of the party, was taken; and it was expressly held that where money was paid by one person for another, on an illegal transaction, *without an express assumpsit*, no action could be maintained.

In none of the cases which I have cited, does it appear that the plaintiff's recovery was made to depend on his having to give evidence of the illegal consideration, or not, before he could lay a ground for a verdict. Indeed, although this rule is laid down in some cases in the books, it cannot be general in its application, as the mere introduction of a bond or promissory note would preclude all further inquiry, and render certain a recovery, no matter how nefarious the consideration. According to this rule, in the case put by the judge of the Circuit Court in *Armstrong v. Toler*, and which I have already considered at some length, if a verbal promise were made to repay the expenses of the suit which had been paid by the consignee, who had agreed when the goods were shipped to him, to make such payment if necessary, the plaintiff on the trial, would prove the suit, the payment of the expenses, and the promise, this would authorize a verdict in his favor; but the judge of the Circuit Court says, (and the Supreme Court sustains him,) the defendant might then prove the original illegal agreement, and that the promise and payment were made in conformity with a stipulation contained therein, and thereby exonerate himself from the demand. It is against every principle of law to determine that a plaintiff, by management, may, without the act of the defendant, place himself in a better situation, and the defendant in a worse, than they otherwise would be,

Certainly if a defendant would be authorized to introduce evidence to prove that a bond or promissory note had been given for an illegal consideration, he would be equally permitted to prove that although executed upon a new consideration, yet that it grew immediately out of an illegal one. It is urged, however, that to determine that the sale to the defendant is illegal and void, is tantamount to deciding that by the purchase, the title to the lands is so irrevocably fixed in the company that they can never sell them. In the present case there is no difficulty on this part of the subject. The company were competent to part from their title, and have done so; the ownership of the land was vested in the purchaser, and this agreement stands precisely as any other of the same kind, to all which the maxim applies, *in pari delicto melior est conditio possidentis*. It will be remembered that this agreement provided for the resale immediately at auction, of all the lands to be purchased; by this provision the two sales are so engrafted into each other, that it is impossible to separate them. If the sales had been made of different tracts of the land purchased by the company at different times, there would not have been so close a connexion between the transactions, and the impolicy might have been on the other side.

It has been contended for the plaintiffs that if the United States do not agitate this question, and sue for a rescission of the sale made to this company, no other person can move a step that way. It is certain that no party to this illegal agreement could successfully apply to the tribunals of the country, as plaintiff, to be relieved from the situation in which he has placed himself; but it is equally certain that any person sued on any part of it may plead its illegality in his defence against any other person whatever. All the cases refered to are those in which similar defences have been urged, and the only inquiry has been, "was the plea sustained?" not, "was it legal to make it." Who is it that has uniformly sued on agreements to prevent competition at auction sales, in the cases in which those agreements have been determined to be illegal? Not the owner of the goods sold, but a party to the agreement who conceived himself injured by not receiving from his fellow, his share of the profits made by the speculation. Such contracts are void as to all the parties concerned, and destroy every agreement which is affected by their polluting touch.

One ground occupied by the plaintiff remains to be examined; it is this, that unless the defendant places the plaintiff, (or the company from whom he purchased,) in as good a situation as he found him, judgment must be given for the plaintiff; and this it is said, he cannot do, because it is proved he has sold the land. ·

The maxim *in pari delicto melior est conditio possidentis,* might afford a sufficient answer to this objection; but waving this, it may be replied, that if this rule applies, it certainly relates to the time at which the whole transaction commenced. At that time what was the situation of the company? They were in the possession of the money placed in the hands of the committee, their agents, by the individuals who composed it, amounting to a thousand dollars each. When the land was purchased by them, they paid down one fourth of-the purchase money, and received the registers certificates. When they sold to the defendant (at a greatly advanced price,) he paid them one fourth the amount or price for which he purchased of them, received a transfer of the register's certificate, and was alone responsible to the United States for the remainder due to them. The company then, collectively, and members individually, particularly those who bought no land at their sale, have profited greatly by their illegal association; and have received for the land purchased of them by the defendant, in part payment for which the instrument sued on, was given, much more than they have paid. As is shown by the testimony, they received in cash an advance of an hundred and twenty-five per cent. on their capital, with a return of the principal, within two or three days of the time of its investment. Surely then they cannot complain, nor this plaintiff, who was one of them, that the defendant does not place them in *statu quo.*

For these reasons, I am of opinion that the judgment should be affirmed; and of this opinion are a majority of the Court.

By JUDGE COLLIER. I have not enjoyed the instructive pleasure of hearing the arguments made in the cases at previous terms, and consequently, am denied the benefit of the lights they doubtless shed on the points of inquiry; I must therefore content myself with expressing an opinion, assisted by such aids as the arguments at the present term, and reflection upon them afford.

The facts admitted by the demurrer to the evidence, so far as material to be noticed, may be thus condensed: At a sale of the government lands in the St Stephens land-district, in April 1819, a company was formed for the purpose of purchasing them. That the stipulations in the articles of their association were, that no individual should have more than one share, for which he should contribute to the funds of the company one thousand dollars; that none others than those wishing to purchase lands should be permitted to become shareholders; that the members of the company should not bid against each other at the government sale; that the company should appoint a committee from among its members to manage its operations; that the committee should name the persons to bid off the land, and that the lands purchased by them were to be resold at public auction in a very short time thereafter, at which sale all persons were permitted to bid; and the difference between the sum paid to the government, and that at which the lands might be bid off at the company sales, was to constitute the profits, and be equally divided between the members of the company; and that the terms of the company sale was one fourth in cash, the three remaining fourths in four years, for which bonds were to be given. It is further admitted that the members of the company persuaded those who wished to purchase public lands to join them, and some of them, where persuasion proved unavailing, employed threats to effect their purpose; that at the government sales but little resistance was made to the company bidders, and they purchased much the larger portion of the lands sold, at about one fourth of the sum they sold for at the company sales; that the auctioneer employed by the government to vend the lands, was a member of the company, and one of the committee to manage its operations; that the defendant, Caller, was one of the company, and that the bond on which the action of the plaintiff is founded, was given for land purchased at the company sales; that there were deposited or pretended to be deposited by the committee on account of real and fictitious persons, in violation of the stipulations of the articles of association, money to more than twice the amount of the shares actually taken, that their dividend might be increased; and that the bonds taken by the company were distributed in equal proportions to the shares represented by the Committee.

In the case of *Holder v. Meggison,* the foregoing facts, to the extent to which they are applicable, are admitted, and the following in addition: that the defendant Meggison, before the lands he wished to purchase were offered at the government sales, agreed with May, a member of the company, that if the company would purchase for him two quarter sections of land which were designated, that he would pay the company two dollars advance per acre upon the government sale.   The company purchased the two quarter sections, refused to acknowledge May's authority to make the agreement, but, as to one quarter, confirmed it, and the defendant became the purchaser at their sale of the other quarter, at eleven dollars per acre; and the bond, on which the plaintiff's action is brought, is for part of the eleven dollar purchase and part of the two dollars advance, the residue of the money agreed to be paid to the company being secured by other bonds.   The question is, do these facts constitute an available defence for the defendant?   Of this question I shall maintain the affirmative.

The government of the United States have, by Congress, its legitimate organ, provided the manner in which its domain shall be disposed of.   They have fixed a value at less than which it shall not be sold; and have directed that it shall be offered at public auction, where it may sell at this minimum, and such an advance as those wishing to purchase may be inclined to pay.   I understand by the adoption of the auction system, that the government designed its lands should sell if not for an ideal, at least for an intrinsic value.   And that this was not ascertained by the minimum, but that the minimum was settled with a regard rather to the expenditures necessary to acquire the lands, and survey them for market, than any other consideration.   And hence the object of government was not effected by a sale of its territory at a sum less than that which, in a fair market, it would yield.   Consequently every association, the tendency of whose purposes is to cause the public domain to sell at a diminished value, thwarts, in this particular, the national policy.

Having noticed the policy of the government on this subject, so far as necessary, I proceed to consider such legal rules as the facts suggest.   Every contract against public policy, or adverse to the enactments of the legislature, is illegal and void. [a]   The principle of this rule is, that no one ought to be heard in a Court of Justice, who-

*a* Wheeler v. Russell, 17 Mass. 256.

seeks to enforce a demand arising out of moral and political turpitude; and it is well sustained by reason and good sense. The tribunals of justice are instituted, among other purposes, with a view to protect the policy of the country; by administering the laws, when they can be directly administered, or by refusing to coerce a compliance with engagements which are not directly inhibited, but which prevent the law from effecting the end it purposes. If only contracts which are directly prohibited were illegal, it would require but little exercise of the imagination, to devise means to evade the law, and the most salutary enactments might be rendered valueless and inefficient. As in every case of a contract against the policy of the country, both parties are *in delicto*, the Courts will not lend a favorable ear to either, but leaves them where it finds them, to adjust their differences without legal assistance. This rule is so well ascertained, that I should close this opinion by an application of it to the facts, did I not consider it due to the expectation and excitement produced by these cases, and other cases of a larger amount and of a similar character, that the authorities by which I sustain myself, should be noticed.

The case of *Armstrong v. Toler*,[a] which was mainly relied on by the plaintiffs, I consider a very strong authority for the defendants. That was a case of an illegal importation of goods by Armstrong and others, resident citizens of the United States, during the late war with Great-Britain. The goods were shipped at St Johns, New Brunswick, and consigned to Toler, also a resident citizen of the United States. They were seized and libelled. The goods were delivered to the agent of the claimants on a stipulation to abide the event of the suit, Toler becoming liable for their appraised value; and a part of the goods were delivered to Armstrong, on his promise to pay Toler his proportion of any sum for which Toler might be liable, should the goods be condemned. Toler paid their appraised value, and brought his action to recover from Armstrong his proportion of the amount. The Charge delivered by the judge in the Court below was excepted to, and assigned for error. In his charge, the learned judge speaks thus: "I understand the rule, as now clearly settled, to be, that when the contract grows immediately out of, and is connected with an illegal or immoral act, a Court of justice will not lend its aid to enforce it; and if the contract be, in part only, connected

JULY 1829.

Carrington
v.
Caller.

with the illegal transaction, and growing immediately out of it, though it be in fact a new contract, it is equally tainted by it." In illustration, he supposes this case: "If the importation was the result of a scheme to consign the goods to the friend of the owner, with the privity of the former, that he might protect and defend them for the owner, in case they should be brought into jeopardy; I should consider a bond or promise, afterwards given by the owner to his friend, to indemnify him for any advances on account of any proceeding against the property or otherwise, to constitute a part of the *res gesta*, or of the original transaction, though it purports to be a new contract. For it would clearly be a promise growing immediately out of, and connected with the illegal transaction. It would in fact be all one transaction, and the party to whom the promise was made, would, by such contrivance, contribute in effect to the success of the illegal measure." The principles maintained by the charge are elaborately considered and fully sanctioned and sustained by the opinion pronounced by the Supreme Court. In *Steers v. Lashley*, *a* the broker, who had been concerned in stock-jobbing transactions, paid the losses, drew a bill on the defendant for the amount, and after its acceptance, indorsed it to a person who knew of the illegal transaction. The Court held that the indorsee, having notice of the cause of drawing the bill, stood in the same situation with the drawer, and as the drawer could not recover the sum for which it was, drawn, so neither could the indorsee. In *Wilbur v. How*,*b* a contract for making a certain road was set up at auction, and it was agreed between the plaintiff and defendant, that if either party should bid it off, it should be divided betewen them: Wilbur bid it off, and refused to give How a share in it according to his agreement; tor the breach of which, How claimed damages. The Court refused to enforce the contract, because it was a fraud on the vendor. In *Howson v. Hancock*, *c* the Court of King's bench say, that no case can be found of an action having been maintained to recover back money paid on an illegal contract, both parties being *particeps criminis*. In *Belding v. Pitkin*, *d* the Court refused to entertain an action on a contract to pay over half the proceeds of an illegal contract, though the money arising from it had been received by the defendant. In *Hunt v. Knickerbocker*, *e* the plaintiffs were managers of a lottery in the State of Connecticut, and delivered to the defendant

*a* 6 Term Rep. 61.

*b* 8 John. 346.

*c* 8 Term Rep. 575.

*d* 2 Caines Rep. 147.

*e* 5 John. 327.

tickets to sell in New-York. The defendant failing to return the unsold tickets according to his contract, the plaintiffs brought an action to recover their value. The Court held that the action was not maintainable, because the contract went to defeat the intent of the act of the Legislature of that State against private lotteries. And Mr Justice Thompson, who delivered the opinion of the Court, recognizes the general principle, that a Court of justice ought not in any manner to assist an illegal transaction. In *Waymell v. Reed*,[a] the sellers in France, by the order of the buyer, packed the goods up in a particular manner, with a knowledge that they were to be smuggled, and was not allowed to recover the price of them of the buyer in England. . In *Maybin v. Coulon*,[b] the action was brought to recover balances claimed of the defendant, on certain transactions, wich it appeared were opposed so the policy of the navigation system. Chief Justice Shippen, in expressing the opinion of the Court, uses this emphatic language: "The act of the court is necessary to give effect to the report of the referees; but no Court of justice of the United States can lend its aid, at any time or in any degree, to recover a debt originating in a source so forbidden, so foul, and so pernicious." In *Wilkerson v. Londonsack*,[c] it is held that the smuggling of prohibited goods into England cannot be made the foundation of an action for not bringing them in a perfect state; and that an action would not lie for the freight of goods in an illegal voyage. It was also ruled, that the intention of the parties could have no influence in determining whether the contract was illegal. 2 Starkie, 117; 4 Dallas, 269, and 308; 6 Massachusetts, 111; and 1 Bosanquet and Puller, 264, furnish cases in which the general rule was recognized and applied. In fact this rule is almost universal; not confined in its operation to this country and England, but it exists in other countries which cherish an enlightened jurisprudence.[d]

Having shewn by the authorities recited, the existence of the rule and its qualifications, so far as important, I next purpose to shew its application; and first to the case of Carrington v. Caller. I consider it a proposition too obvious to require proof, that an association, such as the facts shew to have existed, must have had the effect to prevent the government lands from selling at their fair market value. Whatever may have been the effect, such at least was the tendency of the measure, and no case can

JULY 1829.

Carrington
v.
Caller.

[a] 5 Term Rep. 599.

[b] 4 Dallas 298.

[c] 3 M. and S. 117.

[d] Pothier des Obligations No. 43. & 55.

be found, where an inquiry has been instituted to shew that an actual loss has been occasioned to the government; and it would be apart from the principle of the rule to require it. It is enough if the plans of the company opposed directly the views of the government; and on this point there can be no doubt. The declared purpose of the company was to purchase the lands as cheap as practicable; the object of the government, as manifested by failing to establish a maximum, was to realize their full value.

The purchase at the company sales did not constitute a substantive contract, distinct from the purchase at the government sales; they were both provided for in the articles of association, and had a reference to each other; the one depending upon the other, and so understood and stipulated before the government sales were made. With what propriety then could the plaintiff argue that the purchase by Caller was disconnected with the purchase by the company? Did not the one grow immediately out of the other, and was not the sale at which Caller purchased, the direct and immediate consequence of the purchase by the company? I have endeavored with laborious attention, to discover the two contracts which we have been told exist; and confess that I have been unable to do so. I view the two sales as constituting distinct transactions provided for by one entire contract. As a play embraces many acts and scenes, which disconnected, are imperfect, and discover not its moral, so the stipulations of the association, in order to a full developement of the contract, must be considered as they were made, altogether.

For the purposes of argument, I might admit that in fact two contracts have been proven, and if in truth it were so, the plaintiff would not be benefitted, if the first contract was illegal; because the second, to use the language of the Court in Armstrong and Toler, "would clearly be a promise growing immediately out of, and connected with the illegal transaction." If the members of the company had have divided the lands purchased, before the sales by the company, any disposition by each or either, of his share, would have constituted a new contract, and been recoverable on without regard to the original taint. The case supposed in Armstrong and Toler, of advances made by a friend to whom goods had been illegally consigned, with his consent, and of a promise by the owner to indemnify him for his advances, is a

much stronger case of a new contract; yet the Court there held, that the promise constituted a part of *res gesta* and was tainted by the illegal transaction.

JULY 1829.

Carrington v. Caller.

It has been argued that the defendant cannot object to the payment of his bond, because of the political taint of the contract, unless he has placed the plaintiff in the situation he was in before the bond was executed, or has offered to do it. This argument appears to be an interpolation of the rule by which this description of defence is tolerated. It is proper to examine it. I understand that in relieving against a contract denounced by the policy of a law, the relief is not afforded with a view to favor the defendant, but to discourage contracts which restrain or control the operation of the law; therefore, those principles of justice by the application of which individual rights are settled, are not permitted in such cases to have a controling influence. In *Holman v. Johnson*, [a] Lord Mansfield says, that it is not in favor of the parties that the objection is ever allowed, but it is founded on the principle of public policy, *ex dolo malo non oritur actio*. "No Court," says he, "will lend its aid to a man who founds his cause of action upon an illegal or an immoral act. If, from the plaintiff's own stating, or otherwise, the cause of action appears to arise *ex turpi causa*, or the transgression of the positive law of the country, there the Court say, he has no right to be assisted." That action was brought to recover the price of tea, sold and delivered by the plaintiff in Dunkirk, in France, with a knowledge that it was to be smuggled into England. Yet he had no concern in the smuggling, but sold it in the ordinary course of his business. The contract was complete by the delivery of the tea at the place of sale. But Lord Mansfield said, "if the plaintiff had undertaken to send the tea into England, or had any concern in running it into England, he would have been an offender against the laws of that country." That is a very strong case in favor of the rule, that political taint vitiates a contract, and conclusive to shew that the doctrine of *in statu quo* is inapplicable. If the defendant might in such case be deprived of this answer to the action, unless he would restore to the plaintiff what he had received, the rule would be inefficient, and the defence afforded by it valueless. If in an action for money had and received, the defendant was compelled to pay the plaintiff so much money as in moral

a Cowp. 341.

*a* 4 Dallas 269.

justice he should account for, before he could allege political taint, the principle of the rule would be disregarded, and the reason of it, which is the discouragement of such contracts, would not be subserved.   In *Hawson v. Hancock*, before cited, no effort was made to prevent the defence because the defendant did not offer to pay the money.   In *Mitchell v. Smith*, *a* it was objected that the defendant could not be relieved, because he had received the possession of the lands.   The Court disregarded the objection, and declared the contract void.   I lay it down as a general proposition, that the doctrine of *statu quo* does not apply to a contract void in its inception for illegality, but only to one, which by some *post factum* circumstance becomes so; as if, on a breach of contract by the vendor, the vendee elect to disaffirm, where it has been executed by him either in the whole or in part, he must offer to place the vendor in *statu quo* before he can recover back the money he has paid.   And the cases cited by the plaintiff are all of that character.

For the plaintiff it has been argued, that admitting the contract once to have been impure, it has been purged by its recognition by the officers of government.   There is nothing in the record which shews this to be the fact; but we will suppose it to be so, with a view to test the force of the argument.   The recognition by the government, of the purchases at these sales, can have no influence in determining whether the purposes of the association were impolitic.   The policy of the government was declared by an act of the legislative department, and is not subject to the control of either of the other departments; the subject being one exclusively within the control and superintendance of Congress.   Let it be supposed that Congress had the sagacity to discover that its policy was unwise, and the patriotism to denounce it; would such an act operate an ablution of all the contracts of the company which were affected by the political stain? I apprehend not.   If the contract was illegal when entered into, it is beyond governmental and legislative competency, so far as third persons are concerned, to give to it validity.   That such was the case with the contract we are considering is already shewn.

It is further argued, that before we determine that the contract is illegal, we must believe that the acts of Congress under which the lands were sold, were dictated by

a wise policy. I cannot persuade myself that it would be proper for the judiciary to refuse to give effect to a legislative act, because it did not seem to be the result of wisdom. Such a power in the judiciary places it above the legislature, and gives to it, if I may so speak, political omnipotence; it is a power by no means invidious, and one which I shall take pleasure at all times in repudiating. It belongs exclusively to Congress to legislate upon measures which affect the Union, and its acts, within the legitimate scope of its powers, are not subject to revision by any other authority. Least by what I have said it be supposed that I consider the method of disposing of the United States' lands as expedient, I take occasion to say, that I view the system as unwise in theory and ruinous in practice. As ordinary foresight might have anticipated, the government has not in most cases, received exceeding one half the sum which the settler has had to pay for a home; the other half has been paid to the speculator. As fondness for gain is natural, and the land market has promised such an exorbitant increase, as well the charitable and benevolent, as the unfeeling monster who looks at his gold as the hope of his happiness, have engaged in the scheme of speculation.

Having discussed all the points deemed material to be noticed, and having shewn that the bond of Caller is affected with political taint, it remains only to shew that Meggison's bond is subject to the same objection. Meggison was not a member of the company, but agreed with May not to bid at the government sale, on condition that the company would purchase and sell to him, two quarter sections of land, at two dollars per acre advance. The company recognized the contract as to one quarter, and refused as to the other; it was sold at the company sale, and Meggison became the purchaser. The contract with May, and which the company adopted in part, was against the policy of the law; its effect being to do away competition, by a renunciation by Meggison, of his right to bid. If the consideration of Meggison's bond was the eleven dollar purchase alone, I should be inclined to sustain it, on the ground that it would be founded on a consideration disconnected with the company purchase, and therefore free from political taint. But the two purchases by Meggison, constitute parts of one entire contract, for which bonds were given for the purchase money, without distinguishing the amount of each. I have no hesitancy in determin-

JULY 1829.

Carrington
v.
Caller.

ing that his bond is void; because the contract, being illegal in part, as against policy, it is void for the whole. *a*

I am accordingly of opinion, that the judgments should be affirmed. *

a Crawford's
Ex'r. v. Morrell, 8 John.
195. 1 Chit.
Pl. 296. 1 T.
Rep. 201.

By JUDGE CRENSHAW. I am glad that these cases which have been pending for years, and which have caused much excitement and expectation in our southern community, and on the principles involved in which, it is said that immense sums are yet depending, are now, after three solemn arguments, to be decided and set at rest forever.

In the progress of the argument, at every stage of the proceeding, my first opinion has been strengthened and confirmed in the conviction of my own mind; and though it is my misfortune on the most material points to differ from a majority of the Court, yet I have the consoling reflection that my opinion is the result of much deliberation, and as I believe, is well sustained by the rules of law and the principles of justice.

It appears that in the Court below, the judgments on the demurrer to the evidence were in favor of the defendants, and who are also defendants in this Court.

The facts of the cases are spread upon the record, and as far as they have been refered to in the opinion pronounced by a majority of the Court, they have been correctly recited; it is therefore unnecessary for me again to repeat them. I shall only take notice of those positions and legal deductions in which I am constrained to dissent from the judgment of the Court; for to some of them I yield my most hearty concurrence.

It is said that the original object of the land company being to destroy competition at the land sale, and to buy the public lands at an under value, or at the minimum price fixed by law, was against public policy and therefore void. If this rule be generally correct, yet it is at least questionable whether the peculiar circumstances of the cases at bar do not form an exception to the rule. Could it be against public policy for the people to procure lands and a home in the wilderness of Alabama on the best and cheapest possible terms? Will it be contended that an

* NOTE.—By Judge Collier. Since the determination of these cases, the Supreme Court of the United States, in two cases, Reported in 4. Peters Rep. have fully sustained the view taken in this opinion of the case of Armstrong v. Toler.

obnoxious law, a law which brought the government as a grand speculator into the land market, and which in effect wrung from the citizens exorbitant sums for a very inadequate consideration; a law which of itself was directly in the teeth of sound policy, is to be regarded with the same reverence which is due to those wise regulations, the salutary effects of which on the happiness of society, have been sanctioned by long experience? It is an unusual course for a nation to pursue in disposing of its domain to its citizens by selling it to the highest bidder at public auction; and at least in this State, has been oppressive to all, and entailed irretrievable ruin on many, by loading the whole community with an immense land debt. During the existence of such a law, it is difficult to believe that any combination of the people for the purpose of buying the public lands at a fair and reasonable price was against public policy. But suppose such combination of individuals with such an object in view, forms no exception to the general rule, and further suppose that some members of the company joined mainly with a view to speculation; it is yet maintainable on principles of law and reason, that the purchasers at the sale by the company, cannot refer back to the mode of acquisition or circumstances under which the company acquired the land from the United States, in order to avoid their contract with the company.

The United States voluntarily sold the land to the company. If the combination on the part of the company was unlawful, and vitiated their purchase, the United States might have complained and set it aside; but with a knowledge of all the circumstances, through their agent, the Register, they acquiesced in the proceedings of the company, and confirmed the sale by receiving part payment and granting certificates to them; with their eyes open they confirmed a contract which otherwise might have been avoided; and thus made it good and lawful, and vested in the company an exclusive right to the land. And all the authorities support the position, that if one party know of the imposition practised, or attempted to be practised by the other party, and if instead of rescinding, he proceed to a completion of the contract, this amounts to a waiver or extinguishment of the imposition, and renders the contract lawful and binding. It must then be conceded on all hands, that the company, by their purchase from the United States, became the legal owners of the

26

land, and had a right to sell and dispose of it on any terms they pleased.

As to the case of Meggison, he was not a member of the company, and cannot possibly have any thing to do with the mode or manner in which the company acquired their right to the land. He claims directly from the company, who being the rightful owners when they sold to him, he cannot refer back to the conduct of the company previous to their purchase from the United States, in order to avoid payment of his purchase from the company. To me the doctrine does seem preposterous, and not sustained by law, that after Meggison had purchased land from the company, and with a full knowledge of the imposition, if any had been practised, gave his note for payment, received title, and has since sold the land, he should now be permitted to avoid payment, by a reference back to any circumstance attending the original acquisition from the United States. He has got the land which was unquestionably the property of the company; and does not justice require, and will not the law compel him to pay the price of his purchase to the company who were the rightful owners. But it is here objected that May, a member and agent of the company, agreed with Meggison that he should have the land at an advance of two dollars. It will be recollected that afterwards, by a vote of the company, he actually got one quarter section on those terms: but the company disavowing the authority of May to make the agreement, the other quarter was sold to Meggison at auction for eleven dollars per acre, but instead of then annulling his contract, with a knowledge of all the circumstances, he proceeded to its confirmation by receiving titles from the company, and giving his note for the purchase, and which is the ground of the present action.

I will admit, *pro hac vice*, that May was authorized by the company to make the agreement with Meggison; yet it seems that he placed no reliance on that agreement; for his subsequent conduct in purchasing the land at eleven dollars, giving his note and receiving titles with a knowledge of all the circumstances, is conclusive evidence that he had abandoned May's agreement, and treated it as a nullity, if any such ever existed. And in any point of view, I hold it as absolutely necessary, that Meggison should have offered a restoration of the land to the company, and to have placed them in *statu quo*, before he

could set up such a defence to defeat a recovery on the note. It can make no difference whether Meggison is suing for a recission of the contract, or whether the plaintiffs are suing to recover the purchase money. In either case the same principle of law and justice applies. In either case, before Meggison could succeed, he should place or offer to place the company in the same condition in which they stood before they sold him the land.

As to the case of Caller, the same reasons which create a liability on Meggison, make him equally liable, though he was a member of the company. If the company, by virtue of their purchase from the United States, became the true owners of the land, Caller cannot refer back to the mode of acquisition from the United States, in order to avoid payment for his purchase. The taint of the original transaction was cured or removed by the United States consenting to the sale under the circumstances, before the company resold to Caller: nor can it be readily perceived by what rule of law or logic, the original taint under these circumstances, can be extended to vitiate his contract, and to defeat a recovery of the purchase money. The rule in *pari delicto melior est conditio defendentis* cannot aid him. Though he was a member of the company, and a party to the orignal combination, yet all the unlawfulness of that combination having been done away by the act of the United States in confirming the sale and granting certificates to the company, at the time of his purchase there was no remaining guilt in the first transaction or purchase from the United States which could extend to or vitiate the company's sale to him. If he, with a knowledge of all the material circumstances, still proceeded to bid for the land, to buy it, to receive titles and give his note, surely he ought now to be held to his bargain. If Caller was afterwards cheated by the master spirits of the association in a division of the profits by the A. B. C. scheme, or other artifice, this happened after the sale by the company to Caller, and cannot affect the validity of the note he had given for the land. After he discovered the fraud, if any, he acquiesced, and cannot now complain, and ought to be compelled to pay the price he agreed to give for his land.

If the defence insisted on were legal and available, it surely comes with a bad grace from Caller, who is said to be equally guilty with the other members of the company in the alleged nefarious transaction.

JULY 1829.

Carrington
v.
Caller.

Carrington
v.
Caller.

But how these men, whether members of the company or not, are to be excused from the obligation of contracts fairly made, with a knowledge of all the circumstances, and that too consistently with the rules of law and the principles of justice, I have not capacity to comprehend. If they have received a valuable consideration from the land company, and surely they have, is it just, and is it not a dangerous doctrine to establish, that though they are permitted to retain the consideration, yet they shall be excused from paying the purchase money?

In support of my opinion *vide* 4 Cowen, 11th Wheaton, and the references contained in the brief of counsel. I however respectfully submit to the judgment of a majority of the Court, and rejoice that this long agitated question is at last decided and put at rest, I hope forever.

By JUDGE WHITE. As these cases, in my opinion, depend essentially on the same principles, I shall consider them together. The pleas which went to the delivery of the notes, and the filling of the blanks with the names of the payees, having in effect been disposed of by a case heretofore decided,[a] it only remains to consider of the questions which arise under the pleas of fraud. In the year 1819, at the land sales in St. Stephens, there was a company formed, the object of which was to secure a large quantity of land to themselves, at as small a price as possible. Some wished to secure their own settlements and others to be profited by a resale of the lands bought. To effect this object, and attain the full purposes of the association, they resolved to put down competition. Hence the hopes and fears of many attending the sales were appealed to, with a view to influence them to join the company. On the one hand, they were flattered with the hopes of getting lands by connecting themselves with the company, at a lower price than from the government, and on the other, when it was known that particular persons wished to buy particular tracts including their improvements, they were threatened with the combined wealth and power of the association, in bidding against them. These resorts, as might be expected, were effectual to a great extent, though some held out to the last and would not join. Meggison was of this number. But to induce him not to bid, he was promised two quarter sections which he wanted, at an advance upon government price of two dollars per acre. The business of the company was managed by a committee, and one of

a Boardman
v. Gore &
Williams,
1 Stewart
517.

JULY 1820.

Carrington
v.
Caller.

its fundamental articles was, that none but land buyers should join, each one of whom should advance one thousand dollars. The company bought a great quantity of land, which they soon after resold at public sale, to the highest bidder, requiring from the purchasers one fourth down, and their notes 'or the balance payable in four years. To effect a distribution of these notes, the names of the payees were left blank, and afterwards filled by allotment. Meggison claimed two quarter sections, in conformity to a contract made with May, one of the company: but the committee disclaimed his authority, and would not ratify the contract to the full extent. They however, let him have one quarter section of the least value, at the advance agreed on, and sold him the other at eleven dollars, for part of the price of which, the note sued on was given. It appears that Caller was a member of the company who sold him land at their sale, and took the note which is the foundation of the action against him for part of the purchase money. The testimony of Colonel Darrington shews, that the names of fictitious persons, and of those who were not land buyers, were put in as stockholders, contrary to the stipulations of the articles of association. These are the material facts, extracted from the vast mass of testimony given. The evidence was demurred to, and a judgment *pro forma* rendered for the defendants. To reverse, which, writs of error are now prosecuted.

The first question which arises is, whether this association was contrary to public policy? In examining this point, I do not deem it necessary to inquire into the expediency or inexpediency of selling the lands of the United States, upon credit. If the association tended to thwart the object of the laws upon that subject, it may be admitted to have been contrary to public policy, however deleterious the laws themselves may have proven to the community. What then was the object of these laws? Evidently as I conceive, not only to secure to the government the minimum price, but also whatever the lands would command at public sale on the terms of credit proposed, and under the full operation of fair competition. But this combination had a direct tendency to put down such competition, and thus far was contrary to the policy of the statutes, and a fraud upon the rights of the United States. They then could have disaffirmed the sale, and declared it void, and they had a full opportunity of doing this. For the evidence shows that all these transactions were

known to their agent, the Register, who, notwithstanding his knowledge and avowed disapprobation of the conduct of the company, proceeded to sanction the sale by issuing certificates. After this, the government could not complain, and the simple question presented for our consideration, is, whether these lands thus acquired by a fraud upon the United States, but which they have waived, could be afterwards sold, without such sales being contaminated by the taint of the original transaction. I admit if it were an attempt on the part of the plaintiffs to establish a claim against the defendants, which would require them to go into that transaction, and it were immoral or contrary to public policy, the Courts would refuse their aid, and they could not recover. But if on the contrary, the notes which are the foundation of the present actions, are so disconnected with, and separated from the original sale, as to be sustained by a new and different consideration, then the actions will lie, and the judgments below should be reversed. All will concede that Courts of justice will not open their forums to enforce contracts which are illegal, immoral, prohibited or contrary to public policy. For to do this would be to sanction by law, what the law itself forbids. This principle, though it approves itself to the good sense of all, and appears simple in its character, is nevertheless, as observed by Chief Justice Marshall in the case cited in 11th Wheaton, sometimes difficult of application; and Courts should take care whilst they observe, not to pervert or abuse it. It might be urged that it would tend to discourage immoral and fraudulent contracts, to restrict the subsequent sale of articles so purchased, by prohibiting the recovery of the consideration for which they should be sold. But it is manifest this would be throwing unwholesome restraints upon commerce, and in many instances furnishing facilities to frauds by the very means employed to prevent them. There must then be some rule, which at once guides the application of the principle to salutary purposes, and prevents its perversion. In the case of *Simpson v. Bloss,* [a] it is said "that the test, whether a demand connected with an illegal transaction is capable of being enforced at law, is whether the plaintiff requires any aid from the illegal transaction to establish his claim." The doctrine of this case is to be found in other books of high authority, and seems to my mind, to strike the safe and sensible medium between the two extremes. Then the whole case, as be-

*a* 7 Taunton 246.

fore insinuated, resolves itself into this inquiry, whether the consideration of the notes in these actions, are so separated from the original transaction, as to require no aid from that transaction to enforce their collection? It is admitted they were given for the purchase money of the land, sold by the company at the second sale. But it is contended that as this second sale was contemplated by, and provided for, in the articles of association, it must be viewed as part of one and the same transaction. If this be so, all who purchased at that sale could avoid their contracts, and Meggison must be released as well as Caller. It becomes important then, that this position should be well considered. This single circumstance, that one agreement provides that another should be made, cannot of itself so contaminate the second contract that it should not be sustained. For if such a provision in the original articles of association would have extended to the first sale made by the company, it would equally have affected any other distant and more remote dispositions of the proceeds of the sale, which such articles might have provided for. Suppose for example, they had provided that the lands should be sold, the purchase money laid out in a steam boat, to be plied between certain ports for a number of years, and the profits then divided. Would not the principle contended for prove, that as all these transactions were provided for in the first agreement, every contract made in pursuance of such provisions, could be avoided by reason of the impolicy of the first arrangement out of which they grew; and that too, notwithstanding there might be new and distinct considerations for the support of each? This, it appears to me, is the length to which the argument would carry us, and it evidently leads to consequences too wild and detrimental, to be seriously contended for by any. Should it be said that the notes given for the purchase money at the second sale shall not be collected, because the proceeds were to be divided between the parties to the unlawful combination; then, although the United States, who alone were injured by this combination, waived the fraud practised upon their rights by confirming the sale and conveying a title, the purchasers could not sell again for their own emolument, but must hold the land without the power of alienation. In the cases cited by the defendant's counsel, from 6th, 8th, and 13th Johnson, it was laid down that if two persons agree, that but one shall bid at a sale by auction, with an understanding that

the person not bidding should share the profits of the pur-chase, Courts will not enforce the contract. The reason of this is obvious, for in the first place there was no consi-deration to support the contract, and in the next place it could not be enforced without going directly into the im-politic transaction. But to make these cases parallel with those now under consideration, we will suppose that the bidders at the auction sale had made a further stipulation, that the articles bought should be resold to third persons for their common benefit, that at such second sale notes were taken and sued on, and the defendants resisted a re-covery on the ground of the fraud committed on the rights of the owners of the property sold at auction. Could such a defence prevail, especially after the owners had, with a full knowledge of the fraud, sanctioned the sale by making a title? I presume it could not. But let us more direct-ly apply the test before referred to, as laid down in 7th Taunton, and see whether these notes be founded on the same consideration with the first contract. For if they be so distinct and separate, that the plaintiffs could prove their consideration without deriving aid from the original agreement, they may, and should recover. The first con-tract, though it provided for the sale which produced the consideration of the notes sued on, was itself evidently sustained by a different consideration. Its consideration was the money advanced by the stockholders; that of these notes, the price of the land sold by the company. The undertaking of the first contract was, to do and have done certain acts for the benefit of all concerned; but the notes contain a promise to pay money to the persons to whom they were given. There is both a difference in the consideration, and the promise or undertaking founded on it. If then, aside from the provisions of the statute of frauds, no notes had been given, and suits had been brought to recover the price of the land, they could have been sustained, on proof of a sale of land to which there was a good title, the possession thereof by the purchas-ers, and their having bid it off upon the terms proposed. And if they who sold the land, had transfered their claim in the purchase money to the plaintiffs, the names of the vendore might have been used for the benefit of those really interested. Hence it is apparent that in such a state of things, there would have been no call for aid from the original transaction. Gow on Partnerships, [a] after stating several cases in which recoveries could not

*a* Page 109.

be had, assigns as a reason: "that in all those cases the claim of the plaintiff could not be established except through the illegal contract." Then I should say, on the supposition that this association was contrary to sound policy, that if one of the parties were to sue to enforce its execution, or to recover the money advanced to carry it into effect, or if one of the stockholders were to claim of the committee their proportion of the profits, they would be compelled to develope the original agreement itself, to get at their rights, and therefore a Court would not aid them. But the purchasers having entered into another contract, for a new and distinct consideration, it would be carrying the doctrine to an unwarrantable length to protect them in both the possession of the land they bought, and the price they agreed to give for it, merely because it was stipulated in the articles of association that there should be a second sale, and that sale did take place. I would ask, if the second sale had been held without being provided for in the first agreement, and notes had not been taken, would not the proof, in an action for the purchase money, have been the same as under the existing circumstances? Where would there have arisen a greater necessity to derive aid from the first agreement in the one case than the other? I can perceive none. Yet it is virtually admitted, that but for the articles providing for the second sale, recoveries could be had. This is said to be the fatal link which so closely binds the two transactions that they must be considered as one and the same. But furthermore, these defendants ask in effect for a rescission of the contracts, contrary to the consent, and without the default of the other party, and for their own exclusive benefit. For they hold on to the land whilst they refuse to pay its price. This is so manifestly contrary to the plainest principles of natural justice and common honesty, that it would certainly require a peculiar concurrence of extraordinary circumstances, and a stern application of a most rigid rule, to sustain such a defence. And it is even said that Caller, who not only enjoys his purchase, but for ought we can know may have reaped a rich harvest from being a member of the impolitic association complained of, is from that very circumstance, in a better condition than Meggison who did not belong to the company. This I cannot believe. Courts of justice do not thus directly favor a *particeps criminis.* It is only where the party claiming of them has to require aid from an illegal transaction, that they escape lia-

27

JULY 1829.

Carrington
v.
Caller.

bility; and as that is not necessary in the present cases, Caller is equally responsible with Meggison. But it is said that Meggison was promised by May, one of the committee, that if he would not bid against the company for certain lands which he wanted, he should have them at two dollars advance on government price; that in consequence of this arrangement he did not bid, yet the company refused to let him have any but the least valuable quarter upon the terms proposed, alleging that May was not authorized by them to make such contract. He afterwards bought a second quarter at eleven dollars per acre, and gave his note, which is the foundation of the present action. It is not material to inquire whether May was authorized to make the alleged contract or not. If he was, and it was supported by a sufficient consideration, Meggison should have stood upon his rights, and insisted on its performance. This, however, he did not do, but gave his note, which was a virtual abandonment of his first contract. I am then compelled to dissent from the opinion delivered by a majority of the Court, and say that the judgments below ought to be reversed.

Judgment affirmed.

JUDGE PERRY concurred with JUDGE TAYLOR,

JUDGES LIPSCOMB and SAFFOLD, not sitting.

NOTE.—For the plaintiffs, the following authorities were cited. To shew that none but the government could complain, 4 Cowen 744, 5 John. 47, 2 Henn. and Munf. 245, 3 Bibb 515. That the second sale could not be affected by fraud, Gow 105, 5 Taunton 181, 4 John. 204, 7 Taunton 246, 11 Wheaton 258. That the contract cannot be rescinded because the plaintiff cannot be placed in *statu quo*, 1 Term Rep. 154, 225, 5 East 449, Hardin 602, 4 Mass. 502. 3 Starkie Ev. 1646, 1614, 6 Munford 366, 1 N. R. 263. That proceeding to complete a contract after fraud is discovered, is a waiver of it, 3 Term Rep. 390, 4 Esp. 264, 10 Wheaton 392, 3 Campbell 69.

The following authorities were relied on for the defendants: as to the insufficiency of the delivery of the notes: 1 John. Cases 114, 12 John. Rep. 418, 10 Mass. Rep. 456, Minor's Alabama Rep. 103. As to the alteration of the note by filling the names of the payees, 2 Starkie's Ev. 479, 480, 19 John. Rep. 391, Bullers N. P. 267, 4 Cranch 60, 3 Am. Dig. 183. That the contract was against public policy, 13 Johns. Rep. 112, 6 Ib. 194, Cowp. 39, 1 Comyn on Contracts 28, 36, 37, Douglass 450, 3 Term Rep. 22, 551, Selwyn N. P. 130, 2 Caines Rep. 147, 444. That the notes were void for fraud, 2 Caines 147, 8 John. Rep. 253, Powell on Contracts 176, 185. That money extorted by duress of goods, may be recovered back in assumpsit, 2 Strange 915.